STEPHEN L. RAM, State Bar No. 240769
  sram@stradlinglaw.com
LISA M. NORTHRUP, State Bar No. 293784
  lnorthrup@stradlinglaw.com
NICOLE L. CARBONEL, State Bar No. 329262
  ncarbonel@stradlinglaw.com
STRADLING YOCCA CARLSON & RAUTH
A PROFESSIONAL CORPORATION
660 Newport Center Drive, Suite 1600
Newport Beach, CA 92660-6422
Telephone: 949 725 4000
Facsimile: 949 725 4100

Attorneys for Plaintiffs
CLEANVIEW DISTRIBUTION GROUP LLC,
SMASH HIT TRADING LLC, and GREEN GOLD ICE LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| CLEANVIEW DISTRIBUTION GROUP LLC, a Wyoming limited liability company; SMASH HIT TRADING LLC, a Wyoming limited liability company; and GREEN GOLD ICE LLC, a Wyoming limited liability company,<br><br>Plaintiffs,<br><br>vs.<br><br>LGI HOLDINGS, LLC, a Wyoming limited liability company; ALPHABET WHOLESALE, a business organization, form unknown; ALPHABET WHOLESALE, INC., a corporation; ALPHABET WHOLESALE, LLC, a limited liability company; PEYTON PALAIO, an individual; TED PALAIO, an individual; LAWRENCE LARSEN, an individual; MARK JENNINGS, an individual; MARK JENNINGS, individually and as a director of | CASE NO. 2:21-cv-07178 SB (JCx)<br><br>Hon. Stanley Blumenfeld, Jr.<br><br>[Magistrate Judge: Hon. Jacqueline Chooljian]<br><br>**DECLARATION OF JOHN THOMAS BRYANT IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS COMPLAINT, OR ALTERNATIVELY TO TRANSFER VENUE**<br><br>Date: November 19, 2021<br>Time: 8:30 a.m.<br>Judge: Hon. Stanley Blumenfeld, Jr.<br>Place: Courtroom 6C<br><br>***[Removal from Los Angeles County Superior Court on September 7, 2021]***<br><br>Trial Date: November 7, 2022 |

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

DECLARATION OF JOHN THOMAS BRYANT IN SUPPORT OF OPPOSITION
4856-5526-1696v2/106261-0003                                    2:21-cv-07178 SB (JCx)

| | |
|---|---|
| 1 | Alphabet Wholesale, business form unknown; MARK JENNINGS, individually and doing business as Alphabet Wholesale; JASON FOSTER, an individual; and DOES 1 through 10, inclusive, |
| 2 | |
| 3 | |
| 4 | |
| 5 | Defendants. |

2

DECLARATION OF JOHN THOMAS BRYANT IN SUPPORT OF OPPOSITION

4856-5526-1696v2/106261-0003    8:21-cv-00835 JVS (DFMx)

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

# Declaration of John Thomas Bryant

I, John Thomas "Tommy" Bryant, declare as follows:

1. I manage the day-to-day operations for plaintiffs Cleanview Distribution Group LLC ("Cleanview"), Smash Hit Trading LLC ("Smash Hit"), and Green Gold ICE LLC ("Green Gold"), and together with Smash Hit and Cleanview, the "Cleanview Companies") in the above entitled action. I make this Declaration in support of Plaintiffs' Opposition to Motion to Dismiss Complaint, or Alternatively to Transfer Venue. I have personal knowledge of the facts set forth in this declaration and, if called to testify as a witness thereto, I could and would competently do so.

2. I am a California resident with my primary residence located in Rancho Palos Verdes.

3. The Cleanview Companies maintain their business offices in Wilmington, California, including a warehouse in Wilmington. All employees of the Cleanview Companies are located in California and work out of those business offices. The Cleanview Companies' records and files, and computers, smartphones and other electronic storage devices are all located within Los Angeles County, along with my own records, files, computers, and electronic devices used for the operations of the Cleanview Companies.

4. Due to the Covid-19 pandemic, at all times relevant described below, my conversations and business communications have either been from my home in Rancho Palos Verdes or the business offices of the Cleanview Companies.

**Lawrence Larsen Places A First Order On Behalf of Alphabet Wholesale (LGI Holdings, LLC)**

5. I met Lawrence Larsen in Las Vegas, Nevada approximately two years ago. As part of our initial introduction, I mentioned that I lived and worked in California. Since that time, I periodically had phone conversations with him.

6. During one of the periodic conversations, in approximately April 2020, Mr. Larsen and I spoke when I was in my home office. For the first time, Mr. Larsen inquired about purchasing kratom from the Cleanview Companies. I informed him of the current inventory in our California warehouse and Mr. Larsen agreed to purchase 40,000 kilograms or 40 metric tons. Attached hereto as **Exhibit 1** is a true and correct copy of Invoices Nos. 701 and 702 reflecting Mr. Larsen's original order on behalf of a company he identified as Alphabet Wholesale (only recently through the pending lawsuit, I have been informed that Alphabet Wholesale is a trade name or fictitious name for LGI Holdings, LLC).

7. Based upon the information Mr. Larsen conveyed to me, the first shipment was delivered from the Cleanview Companies' warehouse in California to the address in Oregon that he provided.

8. On or about May 13, 2020, I had a telephone conversation with Mr. Larsen and Peyton Palaio, while I was in my home and I mentioned to them the California location of my home as we briefly chatted about the impact of the Covid 19 pandemic on our personal lives. At the time, Mr. Larsen and Mr. Palaio stated that they operated the largest kratom business in the U.S., that currently had contracted with eight or more suppliers. Mr. Palaio asked about the Cleanview Companies' operations, including the source of its kratom, because Mr. Palaio explained his companies would like to track and trace kratom from farmer to their end distribution point, but that their current vendors were not in a position to do so. I explained that the Cleanview Companies could accommodate that request with some modifications to the current operations. Mr. Palaio stated that he was interested in moving to a single supplier over the current eight or more vendors, if such traceability could be established.

9. As a result of that call with Mr. Palaio, I oversaw changes to the Cleanview Companies operations in order to have unique tracking from each farm

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

4

DECLARATION OF JOHN THOMAS BRYANT IN SUPPORT OF OPPOSITION
4856-5526-1696v2/106261-0003                                    2:21-cv-07178 SB (JCx)

that continued through the entirety of the import and final delivery to Alphabet (or LGI) for future orders.

10. From the original order in approximately April 2020, Mr. Larsen placed additional orders for kratom with me. Typically, Mr. Larsen would call me on my cell phone that has a local (424) area code for Los Angeles and through the entirety of the orders discussed below, I had those conversations while I was in my home. In many of those conversations, we often chatted about the California weather and my location to ride out the Covid-19 pandemic. For each order, Mr. Larsen would discuss his company's needs and I would discuss what amount of product was immediately available or in transit to the U.S. Then, Mr. Larsen and I would discuss the price and quantity, and I would arrange for shipment from the Cleanview Companies' warehouse in California to the destination requested by Mr. Larsen. Following each of those telephone conversations, the Cleanview Companies, mostly through Green Gold, issued invoices for those orders after the product was in transit to the destination requested by Mr. Larsen:

   a. Attached hereto as **Exhibit 2** is a true and correct copy of Invoice No. 703 for 109,000 kilograms;

   b. Attached hereto as **Exhibit 3** is a true and correct copy of Invoice No. 704 for 4,000 kilograms;

   c. Attached hereto as **Exhibit 4** is a true and correct copy of Invoice No. 705 for 15,000 kilograms;

   d. Attached hereto as **Exhibit 5** is a true and correct copy of Invoice No. 706 for 1,200 kilograms;

   e. Attached hereto as **Exhibit 6** is a true and correct copy of Invoice No. 707 for 12,325 kilograms;

   f. Attached hereto as **Exhibit 7** is a true and correct copy of Invoice No. 708 for 4,775 kilograms;

g.  Attached hereto as **Exhibit 8** is a true and correct copy of Invoice No. 709 for 2,000 kilograms;

h.  Attached hereto as **Exhibit 9** is a true and correct copy of Invoice No. 710 for 9,000 kilograms;

i.  Attached hereto as **Exhibit 10** is a true and correct copy of Invoice No. 711 for 114,000 kilograms;

j.  Attached hereto as **Exhibit 11** is a true and correct copy of Invoice No. 712 for a total of 925 kilograms;

k.  Attached hereto as **Exhibit 12** is a true and correct copy of Invoice No. 713 for 2,500 kilograms;

l.  Attached hereto as **Exhibit 13** is a true and correct copy of Invoice No. 714 for 7,000 kilograms;

m.  Attached hereto as **Exhibit 14** is a true and correct copy of Invoice No. 715 for 7,000 kilograms;

n.  Attached hereto as **Exhibit 15** is a true and correct copy of Invoice No. 716 for 36,000 kilograms;

o.  Attached hereto as **Exhibit 16** is a true and correct copy of Invoice No. 717 for a total of 180,000 kilograms;

p.  Attached hereto as **Exhibit 17** is a true and correct copy of Invoice No. 718 for a total of 89,650 kilograms;

q.  Attached hereto as **Exhibit 18** is a true and correct copy of Invoice No. 719 for a total of 72,000 kilograms;

r.  Attached hereto as **Exhibit 19** is a true and correct copy of Invoice No. 720 for a total of 36,000 kilograms

s.  Attached hereto as **Exhibit 20** is a true and correct copy of a second Invoice No. 720 for a total of 89,925; the second invoice was the result of a clerical oversight, but it represents a separate order;

t. Attached hereto as **Exhibit 21** is a true and correct copy of Invoice No. 721 for a total of 72,000 kilograms; and

u. Attached hereto as **Exhibit 22** is a true and correct copy of Invoice No. 722 for a total of 36,000 kilograms.

11. The Cleanview Companies received payments on the above invoices from an entity named Jopen LLC dba A1 Wholesale.

**Larsen and Palaio Propose An Exclusive Supply Agreement To Ensure Alphabet or LGI's Supply Needs Are Satisfied**

12. As the relationship between LGI and the Cleanview Companies progressed, I engaged with Mr. Larsen, Mr. Palaio and others with their companies, via texts messages and phone calls. I had each of those phone conversations or electronic communications from my home.

13. By October 2020, Mr. Larsen told me on multiple phone calls that he and Mr. Palaio were eager to make the Cleanview Companies the single supplier to Alphabet (that I now understand to be LGI) and discontinue the use of other vendors. During the month of October 2020, I had additional phone conversations with Mr. Larsen and Mr. Palaio about the terms for a possible supply agreement.

14. Attached hereto as **Exhibit 23** is a true and correct copy of e-mail correspondence dated October 21, 2020 from Mr. Larsen to me with a draft of the supply agreement as its attachment. In the cover e-mail, Mr. Larsen noted that "P" (which I understood to mean Peyton or Mr. Palaio) would have a few additional revisions.

15. After reviewing the draft dated October 21, 2020, I had more telephone conversations with Mr. Larsen and Mr. Palaio, including one on or about October 26, 2020. I was concerned about Section 1(a)(vi) that dealt with rejected material. To that point in time, Alphabet, LGI, Mr. Larsen, Mr. Palaio, nor anyone else had rejected any product supplied. During a conversation with Mr. Larsen and

7
DECLARATION OF JOHN THOMAS BRYANT IN SUPPORT OF OPPOSITION
4856-5526-1696v2/106261-0003    2:21-cv-07178 SB (JCx)

Mr. Palaio on or about October 26, I requested that the agreement require Alphabet (or LGI) to return any product that it considered defective, and they agreed to do so. During that same conversation, I also discussed other provisions, including the Exclusivity provision in Section 4, and Mr. Larsen and Mr. Palaio agreed to certain revisions.

16. On or around October 26, 2020, I signed the ESA from my home office in Rancho Palos Verdes. Attached hereto as **Exhibit 24** is a true and correct copy of an e-mail dated November 2, 2020 from Mr. Larsen to me, along with its attachment of the fully executed Excusive Supply Agreement ("ESA").

17. The ESA required that the Cleanview Companies maintain an inventory of 800 metric tons of kratom in the U.S. To meet that obligation, the Cleanview Companies maintained that inventory in their warehouse in Wilmington.

18. After execution of the ESA, Mr. Larsen continued to call me in California to place orders, as he had before the ESA, and the Cleanview Companies prepared the following invoices corresponding to those orders:

    a. Attached hereto as **Exhibit 25** is a true and correct copy of Invoice No. 723 for a total of 108,000 kilograms;

    b. Attached hereto as **Exhibit 26** is a true and correct copy of Invoice No. 724 for a total of 72,000 kilograms;

    c. Attached hereto as **Exhibit 27** is a true and correct copy of Invoice No. 725 for a total of 36,000 kilograms;

    d. Attached hereto as **Exhibit 28** is a true and correct copy of Invoice No. 726 for a total of 144,000 kilograms;

    e. Attached hereto as **Exhibit 29** is a true and correct copy of Invoice No. 727 for a total of 90,000 kilograms;

    f. Attached hereto as **Exhibit 30** is a true and correct copy of Invoice No. 728 for a total of 54,000 kilograms;

8

DECLARATION OF JOHN THOMAS BRYANT IN SUPPORT OF OPPOSITION

4856-5526-1696v2/106261-0003      2:21-cv-07178 SB (JCx)

g.  Attached hereto as **Exhibit 31** is a true and correct copy of Invoice No. 729 for a total of 108,000 kilograms;

h.  Attached hereto as **Exhibit 32** is a true and correct copy of Invoice No. 730 for a total of 108,000 kilograms;

i.  Attached hereto as **Exhibit 33** is a true and correct copy of Invoice No. 3001 for a total of 68,000 kilograms;

j.  Attached hereto as **Exhibit 34** is a true and correct copy of Invoice No. 3002 for a total of 76,000 kilograms;

k.  Attached hereto as **Exhibit 35** is a true and correct copy of Invoice No. 731 for a total of 54,000 kilograms;

l.  Attached hereto as **Exhibit 36** is a true and correct copy of Invoice No. 3003 for a total of 18,000 kilograms;

m.  Attached hereto as **Exhibit 37** is a true and correct copy of Invoice No. 732 for a total of 54,000 kilograms;

n.  Attached hereto as **Exhibit 38** is a true and correct copy of Invoice No. 733 for a total of 54,000 kilograms;

o.  Attached hereto as **Exhibit 39** is a true and correct copy of Invoice No. 734 for a total of 54,000 kilograms;

p.  Attached hereto as **Exhibit 40** is a true and correct copy of Invoice No. 735 for a total of 126,000 kilograms;

q.  Attached hereto as **Exhibit 41** is a true and correct copy of Invoice No. 736 for a total of 36,000 kilograms;

r.  Attached hereto as **Exhibit 42** is a true and correct copy of Invoice No. 737 for a total of 54,000 kilograms;

s.  Attached hereto as **Exhibit 43** is a true and correct copy of Invoice No. 738 for a total of 36,000 kilograms; and

t.  Attached hereto as **Exhibit 44** is a true and correct copy of Invoice No. 3004 for a total of 24,000 kilograms.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

19. The Cleanview Companies received payments on the above invoices from an entity named Jopen LLC dba A1 Wholesale and another entity named Liv Group, Inc., except for Invoice Nos. 738 and 3004 which are still outstanding.

**Mr. Palaio Proposes An Acquisition Of The Cleanview Companies And Mr. Palaio And Others Negotiate A Memorandum Of Understanding**

20. Attached hereto as **Exhibit** 45 is a true and correct copy of an e-mail dated January 11, 2021 from Mr. Palaio to me, including its attachment of a slide deck regarding a company named Olistica Life Sciences Group ("Olistica"). Later that same day, I had a telephone call with Mr. Palaio and Mr. Larsen, while I was in my home in California. During the call, Mr. Palaio proudly described that Alphabet and other companies that paid invoices from the Cleanview Companies were part of this larger entity Olistica that spanned kratom and other botanicals across the globe. In particular, Mr. Palaio explained that Olistica was undergoing clinical trials of kratom products, primarily in Canada and seeking regulatory approval to market and sell kratom products. As part of the regulatory process, Mr. Palaio emphasized the importance of traceability from a farm through the whole supply, manufacturing, and distribution chain – Mr. Palaio was far more detailed in this conversation than previous conversations about traceability. Mr. Palaio stated that the Cleanview Companies' modifications to allow traceability were a first step, but he wanted greater control. Mr. Palaio then surprised me by stating that he was interested in acquiring the Cleanview Companies to achieve that control. That was the first of several preliminary calls.

21. Attached hereto as **Exhibit 46** is a true and correct copy of an e-mail dated January 19, 2021 from Mr. Larsen for a Zoom call for January 20, 2021. And, on or about January 20, 2021, I participated in a Zoom call with Mr. Larsen

DECLARATION OF JOHN THOMAS BRYANT IN SUPPORT OF OPPOSITION
4856-5526-1696v2/106261-0003 2:21-cv-07178 SB (JCx)

and Mr. Palaio about Olistica and the possible sale of the Cleanview Companies, and we had a preliminary discussion of possible terms for such a transaction.

22. Attached hereto as **Exhibit 47** is a true and correct copy of an e-mail dated January 26, 2021 from Mr. Larsen for a Microsoft Teams Meeting call for January 28, 2021. On or about January 28, 2021, I participated in a Microsoft Teams call with Mr. Larsen, Mr. Palaio, Mary Cerio, and Jason Foster. Mr. Palaio introduced Ms. Cerio, explaining that she would have a significant role in a possible transaction and for any diligence by Mr. Palaio or the Olistica group. Mr. Foster was introduced as the CFO of Olistica, and as the person who ensured the payment of the Cleanview Companies' invoices from the various other entities in Mr. Palaio's network of companies. Mr. Palaio stated that Mr. Foster would have a significant role in diligence and the terms of the possible transaction. During that call, Mr. Palaio continued his discussion of Olistica's network and its needs, and we continued our preliminary discussion of possible terms for a transaction.

23. Over the next six (6) weeks approximately, I had a series of telephone calls, texts, and e-mail communications with Mr. Palaio, Mr. Larsen, Mr. Foster, Ms. Cerio, and others about the terms of a potential sale of the Cleanview Companies. For all of those conversations and communications, I was in my home in California. Ultimately, we agreed to memorialize the terms in a Memorandum of Understanding ("MOU"). Attached hereto as **Exhibit 48** is a true and correct copy of an e-mail dated March 2, 2021 from Mr. Palaio to me and its attachments, including a draft of the MOU. Mr. Palaio refers to the conversations that I had with him and later he refers to a conversation that I had with "L," who I understood to mean Mr. Larsen. Mr. Palaio also referred to leases for the Cleanview Companies offices in Los Angeles, which I had brought up in prior calls. At the conclusion of Mr. Palaio's e-mail, he proposed another telephone call to discuss the draft of the MOU and I had that call with him on or about March 2.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

DECLARATION OF JOHN THOMAS BRYANT IN SUPPORT OF OPPOSITION
4856-5526-1696v2/106261-0003    2:21-cv-07178 SB (JCx)

24. Following the March 2 draft of the MOU and our call, I had additional conversations with Mr. Palaio and Mr. Larsen. Attached hereto as **Exhibit 49** is a true and correct copy of an e-mail string dated March 9, 2021 through March 10, 2021 that included Mr. Palaio, Ms. Cerio, Mr. Larsen, and me regarding various concerns and revisions to the MOU.

25. Attached hereto as **Exhibit 50** is a true and correct copy of e-mail string dated March 9, 2021 to March 10, 2021 that included Mr. Palaio, Mr. Foster, Ms. Cerio, Mr. Larsen, and me about the certain revisions to the MOU and then seeking a direct invoice from a supplier of the Cleanview Companies upon the signing of the final MOU.

**The Cleanview Companies Provide Requested Diligence Information Under The MOU And Its Non-Disclosure Agreement**

26. After the signing of the MOU and its Non-Disclosure Agreement on or about March 10, 2021 until June 2021, I continued to have frequent telephone calls, texts, and e-mail communications with Mr. Palaio, Mr. Larsen, Ms. Cerio, and Mr. Foster; I had those communications primarily from my home and the business offices of the Cleanview Companies in California.

27. On or about April 5, 2021, Mr. Palaio began sending me text messages about various aspects of the Cleanview Companies' business, diligence, and the terms for a definitive purchase and sale agreement (the "PSA"). Attached hereto **as Exhibit 51** is a true and correct copy of the initial text messages exchanged between Mr. Palaio and I on April 5, 2021, that included his references to telephone calls between us, again with Mr. Palaio referring to himself as "P".

28. Attached hereto as **Exhibit 52** is a true and correct copy of additional text messages between Mr. Palaio and me from April 9, 2021 and April 12, 2021, that refers to a call that I had with Ms. Cerio and inquiring into the status of the draft PSA. The text string includes a video that I shared of the location in

Indonesia where a facility was being built that was part of the MOU and the contemplated PSA.

29. Attached hereto as **Exhibit 53** is a true and correct copy of an e-mail dated April 12, 2021 from Ms. Cerio to me with copies to Mr. Palaio and Mr. Larsen and its attachment of a draft of the PSA. Following receipt of that draft, I had a telephone call with Mr. Palaio regarding various terms.

30. Attached hereto as **Exhibit 54** is a true and correct copy of text messages between Mr. Palaio and me from April 20, 2021 through April 22, 2021, regarding a payment he incorrectly sent to the Cleanview Companies in Wyoming and that Mr. Palaio had re-routed to the Cleanview Companies' business offices in California.

31. Attached hereto as **Exhibit 55** is a true and correct copy of text messages between Mr. Larsen, Mr. Foster, Ms. Cerio and me from April 16, 2021 through April 27, 2021. Among other things, Mr. Foster asks for information to process payment and to send to the Cleanview Companies' offices in California.

32. Attached hereto as **Exhibit 56** is a true and correct copy of an e-mail string dated from April 19, 2021 through April 27, 2021 that included Mr. Foster, Mr. Palaio, Mr. Larsen and me, and its attachments.

33. Attached hereto as **Exhibit 57** is a true and correct copy of an e-mail dated April 23, 2021 from Mr. Palaio to me and its attachment of an updated draft of the PSA. In the e-mail, Mr. Palaio suggested a call to discuss the terms of the PSA and we had that call on or about April 23, 2021, when Mr. Palaio described various revisions to the PSA from the earlier draft and his reasons for them.

34. I continued to have frequent telephone calls and exchange text messages with Mr. Palaio, Mr. Larsen, and Ms. Cerio after April 23, 2021 to discuss various aspects of the Cleanview Companies' operations as part of diligence under the NDA and to negotiate the terms of the PSA. For example, I had a Zoom conference with Mr. Palaio and Ms. Cerio on or about April 29, 2021,

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

where we discussed altering the structure of a royalty or commission payment structure of the draft PSA to a flat agreed upon amount to acquire the Cleanview Companies. Shortly after that conversation, I had another telephone conversion with Mr. Palaio where he agreed to this new structure and agreed upon $30 million as the principal consideration for the Cleanview Companies for the PSA.

### The Cleanview Companies Accommodate Ted Palaio To Conduct Diligence, But The Plot Unfolds To Destroy The Once Thriving Cleanview Business

35. Around the time of the MOU, Mr. Palaio had stated that as part of diligence, a member of his team would need to visit and meet individuals in Indonesia to verify aspects of the Cleanview Companies' supply chain. Later, Mr. Palaio proposed to send his "uncle" Ted Palaio to verify those contacts; I am informed that Ted Palaio also uses the name Ted Lavelle. To assist, I coordinated with a supplier of the Cleanview Companies, Irvan Januardi of Indobotanical Trading Company to sponsor Ted Palaio's visa, arrange lodging, transportation, guides, and appointments with various key individuals in the Cleanview Companies' supply chain.

36. Attached hereto as **Exhibit 58** is a true and correct copy of text messages from April 18, 2021 to April 19, 2021 between Peyton Palaio and me regarding conversations that I had with Ted Palaio and his diligence in Indonesia. As part of the text string, I included a screenshot from a text from "T Thailand" who was Ted Palaio. At the time, Ted Palaio and Peyton Palaio had been concerned about disclosing the potential sale of the Cleanview Companies to Mr. Januardi of Indobotanical Trading Company, which is referenced in the text string.

37. On or about April 19, 2021, I spoke with Ted Palaio from my home in California about diligence and discussing the acquisition of the Cleanview Companies with Mr. Januardi.

14
DECLARATION OF JOHN THOMAS BRYANT IN SUPPORT OF OPPOSITION
4856-5526-1696v2/106261-0003                                    2:21-cv-07178 SB (JCx)

38. Over the next few weeks, I had nearly daily text messages and phone calls with Ted Palaio as he was traveling in Indonesia to meet key individuals within the supply chain and the tour the facility that was being built as part of the PSA. For each of those calls and texts, I was primarily at my home in California.

39. Ted Palaio's stay in Indonesia began open-ended and, in fact, his wife joined him (again sponsored by Mr. Januardi). I soon became concerned that Ted Palaio was no longer just meeting and verifying individuals and aspects of the supply chain because I had been informed that he was actively lobbying local Indonesian government officials for changes to laws regarding kratom using contacts he learned from the Cleanview Companies.

40. On or about May 24, 2021, I participated in a conference call with Peyton Palaio, Ms. Cerio, and various attorneys for Peyton Palaio and the Cleanview Companies. During that call, I confronted Peyton Palaio with my concerns about Ted Palaio's activities. He did not respond himself to my concerns, but others, including Ms. Cerio, tried to downplay the issue and suggest that I was mistaken.

41. Soon after, the PSA negotiations completely stalled and Ted Palaio was still in Indonesia (I am informed that Ted Palaio only departed from Indonesia in October 2021). Peyton Palaio, Mr. Larsen, and Mr. Foster had failed to pay various invoices from the Cleanview Companies and separate invoices from Indobotanical Trading Company.

42. Moreover, Peyton Palaio and Mr. Larsen have refused to accept delivery of additional kratom shipments that were still being stored in the Cleanview Companies' warehouse in Wilmington. Peyton Palaio and Mr. Larsen also have failed to place any new orders for kratom despite the obligations in the ESA for nearly five (5) months. These actions, among others, have forced the Cleanview Companies to cease active operations and destroyed the once thriving business.

43. The text messages with Peyton Palaio, Mr. Larsen, Ted Palaio, Ms. Cerio, Mr. Foster, and others that are provided as Exhibits to this declaration are a sample of the text messages that I had with them; the entirety of the text messages span hundreds of pages.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

JOHN THOMAS BRYANT