Exhibit 53

**From:** Mary Cerio <maryc@olisticagroup.com>
**To:** Lisa <tommylisa888@yahoo.com>
**Cc:** Peyton Palaio <Biolife@protonmail.com>; Island Life <Islandlife808@protonmail.com>
**Sent:** Monday, April 12, 2021, 05:57:33 AM PDT
**Subject:** PSA - Draft

Tommy,

Please find attached the first draft of the Purchase and Sale Agreement.

Please note, this is in draft format and remains open for edits/insertion for both parties.  If you wish to make any edits, please be sure to use Track Changes so that all updates/edit can easily be reviewed.

Please feel free to forward this to your attorneys if you wish to start with his review.

Thank you,

Mary



### Mary Cerio

Strategic Advisor

**Phone** : 339-201-3238

**Email** : Maryc@olisticagroup.com

**LGI HOLDINGS, LLC**
**&**
**CLEANVIEW DISTRIBUTION GROUP, LLC**

**PURCHASE AND SALE AGREEMENT**

THIS PURCHASE AND SALE AGREEMENT (this "**Agreement**") is entered this ____ day of April, 2021 (the "**Effective Dat**e"), by and among CLEANVIEW DISTRIBUTION GROUP, LLC, a Wyoming limited liability company with an address at _____ (the "**Seller**"), and LGI HOLDINGS, LLC, a Wyoming limited liability with an address at _____ (the "**Buyer**") (each the Seller and Buyer a "**Party**", and together, the "**Parties**").

**W I T N E S E T H:**

WHEREAS, Seller holds certain access to importation processes; controls the supply arrangements with Indobotanical Trading Co and shipping arrangements with various parties; has leased a warehousing facility in the United States; is involved with the development of land located in Indonesia on which a drying and grinding facility is being constructed; has developed and currently maintains relationships both domestically and internationally for such processes; and desires to release and transfer the foregoing and related know-how (together, the "**Import Process**") to the Buyer.

WHEREAS, Buyer maintains a desire to the exclusive right to utilize the Import Process and Seller's confidential or proprietary information for the purpose of manufacturing and selling the specific raw materials imported to the United States through the Import Process and which has been qualified under the agricultural product classification authorized and defined by the US Government (the "**Import Product**").

WHEREAS, Seller and Buyer believe it is in their mutual interest and desire to enter into an agreement whereby Buyer would obtain the exclusive rights to the Import Process pursuant to the terms and conditions hereinafter provided.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, agree as follows:

## 1.     TERM

**1.1.** The term of this Agreement (the "**Term**") shall be six (6) years, unless sooner terminated pursuant to Section 6.1 or Section 9.8, below.   Upon the expiration of the Agreement, Buyer retains the exclusive rights to the Import Process and Seller is restricted from

## 2.     EXCLUSIVITY

**2.1.**     The Buyer and Seller both agree that during the Term neither Party will not enter into any competing Import Processes, including the supply or shipping contracts, for the Import Product until and unless any existing contract supplier(s) and/or existing contract shipping company(ies) are no longer able or willing to:

**2.1.1.**   Meet the required specifications for the Import Product;

**2.1.2.**   Meet the required quantities of Import Product;

**2.1.3.**   Ensure the timeliness of delivery for Import Product; and,

**2.1.4.**   Produce the Import Product or certain other materials.

## 3.     COMPENSATION

**3.1.     Royalty Payments.**  During the Term, Buyer will pay to Seller an earned royalty (the "**Royalty Payment**") has outlined in the below the Royalty Payment Table (the "**Table**"). Royalty Payments for the Import Product are to be paid monthly in arrears, commencing on the 1st month following execution of the Effective Date of the Agreement.  So long as the Business operations and the Import Product are not deemed illegal, and the supply chain is able to meet the Buyer's requirements as outlined above in the Exclusivity section of this MOU, Buyer will guarantee a monthly minimum of 300 KG of the Import Product during the first four months of the Term (the "Initial Minimum Commitment"), increasing thereafter to 320 KG.  The Initial Minimum Commitment will be dependent upon the successful build out of a facility in Indonesia to be fully operational for the processing and release of material for export.

**3.1.1.**   Royalty Payment Table**.**

| Year | Minimum Royalty Payment | Maximum Royalty Payment |
| --- | --- | --- |
| Year 1 | 0 - 349 Tons – USD 1.50/KG | 350+ Tons – USD 1.28/KG |
| Year 2 | 0 - 424 Tons – USD 1.47/KG | 425+ Tons – USD 1.25/KG |
| Year 3 | 0 - 499 Tons – USD 1.44/KG | 500+ Tons – USD 1.22/KG |
| Year 4 | 0 - 574 Tons – USD 1.41/KG | 575+ Tons – USD 1.19/KG |
| Year 5 | 0 – 649 Tons – USD 1.39/KG | 650+ Tons – USD 1.16/KG |
| Year 6 | 0 – 724 Tons – USD 1.36/KG | 725+ Tons – USD 1.13/KG |

**3.2.     Discount Incentive Sharing.**  A **"Commission"** for obtaining discounts to the then current wholesale price per kilogram will be paid to the Seller at the rate of 35.0% of the Net Discount Value.  Commissions are to be paid monthly in arrears commencing after the first month the discount is achieved.   **Net Discount Value** shall be calculated by subtracting the **Discounted Expense** from the **Beginning Expense** during the **Period,** less a variable **OpEx Deduction.**  The Commission will be 35.0% of the Net Discount Value.  See Exhibit A for defined terms.

**3.3.     Payment Terms.**  All dollar amounts referenced herein shall refer to US Dollars ("**USD**"). Payments with designated payment dates, if any, are due and payable on or before those dates. Royalty Payments shall be made within thirty (30) days after the end of each calendar month for the calendar month. Payments to Seller hereunder are generally expected to be made by ACH or wire transfer.

**3.4.     Payment Account.**  All payments to the Seller hereunder shall be made by the Buyer to the account designated, and pursuant to instructions provided, by the Seller to the Buyer in writing.

**3.5.     Books and Records.**  Buyer agrees to provide Seller with access to the shipping logs throughout the term of the Agreement to ensure Royalty Payments are accurate.

# 4.  OBLIGATIONS AND CONTINGENCIES

**4.1.     Release.**  See attached Exhibit B for release of Buyer obligations under the existing supply contract (the Exclusive Supply Agreement, dated October 26, 2020), the "**Contract Release**."

**4.2.     Invoice Agreement.** Seller agrees to the invoice schedule included in Exhibit B.

**4.3.     Replacement Materials**. Buyer will be provided, at no cost, with approximately 320 tons of material to replace that which was delivered under the Exclusive Supply Agreement and which did not meet Buyer's specifications (the "**Replacement Material**").  The Replacement Materials will be delivered in equal monthly installments over a 12-month period, commencing in month 13 of this agreement.

**4.4.     Land Purchase Reimbursement.**  Upon execution of the Agreement, Buyer will reimburse Seller for USD 40,000 for the purchase of land in Indonesia on which a facility will be constructed, per the Memorandum of Understanding for Building Drying and Grinding Facility between Irvan Januardi / Indobotanical Trading Company and Cleanview Distribution Group LLC, executed on March 3, 2021.  Additional reasonable expenses incurred by Seller prior to the signing of the PSA will be reimbursed upon submission of all relevant invoices/documentation.  Upon the Effective Date of the Agreement, a new memorandum of understanding between the Buyer and Irvan Januardi / Indobotanical Trading Company will be negotiated.  At such time, additional expenses incurred or contemplated must first be approved by the Buyer's Chief Executive Officer or Chief Financial Officer.

**4.5.** **Contingencies.** The Agreement and Compensation will be contingent on the following:

- Successful transfer of control and ownership of the facilities (domestic and abroad);
- Introduction to all major contacts at the origination sites in Indonesia;
- Successful transfer of the lease for any warehousing facilities, domestic or otherwise, used by the Business;
- Continued support throughout the Term to ensure continuity of the Business' daily operations;
- Seller guarantees that the import and supply channels previously established, utilizing previously established inspection and importation means and methods, will be maintained and remain operational throughout the Term;
- Quality control inspections and testing to occur at the drying/milling facilities to ensure specifications are met; and
- Assistance with and coordination of the build out of a farming management and agricultural processing structure in Indonesia.
- Confirmation of the legal action with the US Government that authorizes the import of the Import Product;
- Confirmation that the Import Product shipping manifests, invoices, packing lists, certificates of origin, and letters of intended use all align with the US Government authorized code(s);
- Seller will negotiate an agreement with the raw material supplier in Indonesia to establish the quality standard (set by Buyer) and to reach agreeable terms for quality inspection and verification of raw material. Seller will support the implementation of the Buyer's quality control testing prior to the acceptance of raw material for export. Additionally, a return policy would accompany this agreement;
- Confirmation of the achieved pricing for supply and shipping of the Import Product;
- Confirmation that to date, no containers have been lost or otherwise seized;
- Confirmation that there is not existing or pending legal action against the Business or the owner(s) of the Business; and
- Confirmation of any outstanding debts.

## 5. INDEMNIFICATION AND INSURANCE

### 5.1. Indemnification

**5.1.1.** Seller shall defend, indemnify, and hold harmless Buyer and its owners, managers, officers, staff, employees, agents, officers, directors, shareholders, and each of their respective successors, heirs, and assigns (the "**Buyer Indemnified Parties**") against all losses, damages, liabilities, costs (including reasonable attorneys' fees) ("**Losses**") resulting from any claims, suits, actions, demands, judgements, actions, or other proceeding ("**Claim**") arising out of Seller's breach of any representation, warranty, covenant, or obligation under this Agreement or arising for violations made prior to the Effective Date of this Agreement.

**5.1.2.** Seller will defend, indemnify, and hold Licensor, and its owners, managers, officers, staff, employees, agents, officers, directors, shareholders, and each of their respective successors, heirs, and assigns (the "**Seller Indemnified Parties**") against all Losses resulting from any Claim arising out of the design, production, manufacture, sale, use in commerce or in trials, lease, or promotion by Buyer or any an affiliate agent, or sublicensee or manufacturer of any Import Product, process or service relating to, or developed pursuant to, this Agreement.

**5.1.3.** To the extent permitted by applicable law, the indemnifying party's indemnification under subsection 5.1.1 and 5.1.2 will apply to any liability, damage, loss, or expense whether or not it is attributable to the negligent activities of such Indemnified Party. The indemnification obligations under subsection 5.1.1 and 5.1.2 will not apply to any liability, damage, loss, or expense to the extent that it is attributable to the gross negligence or willful misconduct of any such Seller Indemnified Party or Buyer Indemnified Party.

**5.1.4.** The indemnifying party agrees, at its own expense, to provide attorneys reasonably acceptable to the indemnified party as the case may be, to defend against any actions brought or filed against any indemnified parties with respect to the subject of indemnity to which such indemnified parties are entitled hereunder, whether or not such actions are rightfully brought. The indemnified party will cooperate in the defense thereof, provided, however, that indemnified party will have the right, but not the obligation to control the defense, at its expense, of any such actions. The Indemnified Parties may, at their option and expense, have their own counsel participate in any proceeding which is under direction of indemnifying party and will cooperate with indemnifying party and its insurer in the disposition of any such matter; *provided*, *however*, that if indemnifying party will not defend such actions, the indemnified party will have the right to defend such actions themselves and recover from indemnifying party all reasonable attorneys' fees and expenses incurred by it during the course of such defense.

## 6. TERMINATION

**6.1.    Termination for Breach**. If either Seller or Buyer should (a) materially violate or fail to perform any material covenant, condition or undertaking of the Agreement, or (b) have a bankruptcy action filed against it, or (c) have a receiver appointed for it; then the non-breaching Party may give the breaching Party written notice of such default. If breaching Party should fail to cure such default within one hundred and twenty (120) days of notice of such default, then this Agreement may, at the non-breaching Party's option, be terminated by a second written notice to the breaching Party.

**6.2.    Accrued Obligations**. Termination of this Agreement will not relieve any Party of any obligation or liability accrued hereunder prior to such termination or rescind or give rise to any right to rescind any payments made or other consideration given to Seller or Buyer hereunder prior to the time such termination becomes effective. Such termination will not affect in any manner any rights of Seller arising under this Agreement prior to the date of such termination.

**6.3.** **Survival**. The provisions of Article 5 (Indemnification and Insurance), Section 6.2 (Accrued Obligations), this Section 6.3 (Survival), Article 7 (Representations and Warranties; Limitations on Liability), Article 8 (Confidentiality), and Article 9 (Miscellaneous) will survive the expiration or earlier termination of this Agreement.

## 7.  REPRESENTATIONS AND WARRANTIES; LIMITATIONS ON LIABILITY

**7.1.** Seller representations: Seller represents and warrants that: (i) Seller owns the entire right, title, and interest in and to Cleanview Distribution Group, LLC; (ii) Seller has the right to sell the entity and to transfer the rights of relevant contracts; (iii) Seller has not granted to any third party: similar access to the Import Process; access to corresponding contacts or contractual arrangements; or, offered the opportunity to purchase the Import Product; (vi) the Import Process is, as of the Effective Date, a valid importation process per the US Food and Drug Administration; (vii) Seller has implemented and will maintain administrative, physical, and technical safeguards to protect the Import Process from unauthorized access, disclosure, destruction, alteration, accidental loss, misuse, or damage that are no less rigorous than accepted industry practices; and (vii) Seller warrants that the land to be purchased and the development of the facility in Indonesia will be legally owned, well-crafted, and suitable and functional for Buyer's purposes.

**7.2.** Mutual representations: Each Party represents and warrants to the other Party that, as of the Effective Date: (i) it is duly organized, validly existing, and in good standing under the laws of the state or jurisdiction of its organization; (ii) it has the full right, power, and authority to enter into this Agreement and to perform its obligations hereunder; (iii) the execution of this Agreement by its representative whose signature is set forth at the end hereof has been duly authorized by all necessary corporate action of such Party; and (iv) when executed and delivered by such Party, this Agreement will constitute the legal, valid, and binding obligation of that Party, enforceable against that Party in accordance with its terms.

**7.3.** Except for the indemnification obligations of section 5.1.1, 5.1.2, and either party's breach of section 8 (confidentiality), in no event will either party's aggregate liability to the other party for any claims, losses, injuries, suits, demands, judgments, liabilities, costs, expenses, or damages, for any cause whatsoever (including but not limited to, those arising out of or related to this agreement) and regardless of the form of action or legal theory, exceed the amount of fees, interest, and costs of collection due to seller from buyer pursuant to this agreement at the time of such claims, losses, injuries, suits, demands, judgments, liabilities, costs, expenses, or damages. Limitations of liability reflect the allocation of risk between the parties. The limitations specified in this article 7 will survive and apply even if any limited remedy specified in this agreement is found to have failed of its essential purpose.

## 8.  CONFIDENTIALITY

**8.1.** **Confidential Information**. As used in this Agreement, "**Confidential Information**" shall mean confidential or proprietary information exchanged between the Parties hereto and relating to the Import Process, or the performance of the obligations set forth herein. Confidential Information will include (a) written or other tangible information marked as confidential or proprietary, (b) orally disclosed information that is identified as confidential and

summarized in a notice delivered within thirty (30) days of the disclosure, (c) information that should reasonably be considered confidential under the context in which the disclosure is made (for example, nonpublic patenting information and nonpublic infringement information), and (d), the Trade Secret Right and any related know-how. Buyer and Buyer each acknowledge that the Trade Secret Right is currently held as a trade secret and recognize the material obligation to keep the processes, designs, and information making up the Trade Secret Right confidential.

**8.2. Confidentiality Obligations.** Each Party agrees to (a) maintain the other Party's Confidential Information in confidence, and (b) not disclose the other Party's Confidential Information to any other party, without the prior written consent of the disclosing Party. Each Party agrees to limit its use of the other Party's Confidential Information to the purposes permitted by this Agreement.

**8.3. Exclusion from Confidentiality Obligations.** Confidential Information does not include information which (a) was in the receiving Party's possession prior to disclosure to it by the disclosing Party; (b) is or hereafter becomes, through no fault of the receiving Party, part of the public domain by publication or otherwise; (c) is furnished to the receiving Party by a third-party after the time of disclosure hereunder as a matter of right and without restriction on its disclosure; or (d) is independently developed by employees or agents of the receiving Party independently of and without reference to Confidential Information received from the disclosing Party.

## 9. MISCELLANEOUS

**9.1. Binding Agreement; No Third-Party Beneficiaries.** This Agreement, and all the terms and provisions hereof, shall be binding upon and inure solely to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns and, except for the indemnification provisions set forth in Section 5.1 of this Agreement, nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement or the transactions contemplated hereunder.

**9.2. Governing Law.** This Agreement will be construed, governed, interpreted and applied in accordance with the laws of the State of <<STATE>>, except that questions affecting the construction and effect of any patent will be determined by the law of the country in which the patent was granted, if applicable. The Parties consent to the exclusive personal jurisdiction of the state and federal courts of the State of <<STATE>>.

**9.3. Entire Agreement.** This Agreement, including any exhibits or attachments hereto, embodies the entire agreement and understanding among the Parties to this Agreement and supersedes all prior agreements and understandings relating to the subject matter of this Agreement. None of the terms or provisions of this Agreement may be altered, modified, or amended except by the execution of a written instrument signed by the Parties hereto.

**9.4.    Severability**.  The provisions of this Agreement are severable, and in the event that any provisions of this Agreement are determined to be invalid or unenforceable under any controlling body of law, such invalidity or unenforceability will not in any way affect the validity or unenforceability of the remaining provisions hereof.

**9.5.    Construction**. All Parties contributed equally to the drafting of all parts of this Agreement and agree to all of the terms herein. All Parties reviewed this Agreement thoroughly prior to execution.

**9.6.    Notices**. All notices, requests, consents and other communications to be provided under this Agreement must be in writing and will be delivered in person or sent overnight delivery by a nationally recognized courier or by certified or registered mail, return receipt requested to the addresses provided below, and will be deemed to have been given when hand delivered, one (1) day after mailing when mailed by overnight courier or five (5) days after mailing by registered or certified mail:

> If to Buyer, to:
>
> LGI Holdings, LLC
> <<ADDRESS>>
>
>
> If to Seller, to:
>
> Cleanview Distribution Group, LLC
> <<ADDRESS>>

**9.7.    Waiver**. No waiver by either Party hereto of any breach or default of any of the covenants or agreements herein set forth will be deemed a waiver as to any subsequent or similar breach or default.

**9.8.    Force Majeure**. No Party will be liable for failure or delay of fulfillment of all or part of this Agreement directly or indirectly owing to any (i) Act of God, (ii) hurricane, tornado, flood, fire, earthquake, or  explosion, (iii) war, invasion, terrorist acts or rioting, (iv)  government order, law, regulation, ordinance, or code enacted, adopted or issued after the date hereof, or any change in law or regulation, action, or previously issued interpretation or application of a law, code, regulation or other governmental requirement issued or becoming effective after the date hereof, or any moratorium, embargo or blockade in effect on or after the date of this Agreement, (v) inability to obtain labor or materials, (vi) epidemic, pandemic, or quarantine or (vii) any other cause or circumstances beyond the Parties' control (any of the foregoing a "**Force Majeure Event**").  In the event that any Force Majeure Event shall occur and be continuing for twelve (12) or more consecutive months, then either party shall have the right to terminate this Agreement upon thirty (30) days prior written notice to the other.

**9.9.     Headings**. The headings of the articles and sections are inserted for convenience of reference only and are not intended to influence the interpretation of this Agreement.

**9.10.    Counterparts**. This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. Further, a Party's signature to a copy of this Agreement will be deemed a signature to, and may be attached to, any other identical copy of the Agreement. Facsimile and electronic signatures will be as binding and effective as original wet signatures.

**[SIGNATURE PAGE TO FOLLOW]**

**IN WITNESS WHEREOF**, the Parties hereto, intending to be legally bound hereby, have executed and delivered this Agreement as of the date set forth above.

**CLEANVIEW DISTRIBUTION GROUP, LLC**

By: _____
      Name:
      Title:

**LGI HOLDINGS, LLC**

By: _____
      Name:
      Title: